UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALAN WILLIAMS,<br><br>        Petitioner,<br><br>      v.<br><br>FIDENCIO N. GUZMÁN,[1]<br><br>        Respondent. | Case No. 2:12-cv-08287-MCS-RAO<br><br>**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS** |

---

[1] Fidencio N. Guzmán, the current warden of the facility in which Petitioner is incarcerated, replaces Raymond Madden as the respondent to this action pursuant to Federal Rule of Civil Procedure 25(d).

1

Petitioner Alan Williams petitions the Court for a writ of habeas corpus under 28 U.S.C. § 2254. After over a decade of litigation, one subclaim within Petitioner's second ground for relief remains: Petitioner asserts his trial counsel rendered constitutionally defective assistance by failing to perform any investigation into victim-witness Dayon Garrison and witness Christopher Ward. Upon review of a report and recommendation by United States Magistrate Judge Rozella A. Oliver, pursuant to 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b)(3), the Court received further testimony from Mr. Garrison, Mr. Ward, Deputy District Attorney Frank Santoro, and Detective John Duncan toward the prejudice element of the remaining subclaim. For the reasons set forth below, the Court rejects Judge Oliver's recommendation as to the prejudice element of the claim, otherwise accepts and adopts Judge Oliver's report and recommendation, and grants the petition.

## I.      BACKGROUND

A Los Angeles County Superior Court jury convicted Petitioner of two counts of premeditated attempted murder. (1st R. & R. 1, ECF No. 75.) In brief, the prosecution asserted at trial that Petitioner shot Mr. Garrison and Khafra Akbar outside a barber shop in Compton in 2006. (*See generally id.* at 4–10.) In 2008, the trial court sentenced Petitioner to 80 years to life in state prison. (*Id.* at 1.) The state courts affirmed Petitioner's conviction on appeal and denied Petitioner's subsequent habeas petitions. (*Id.* at 2.) Petitioner initiated this § 2254 proceeding in 2012, asserting four grounds for relief. (Pet., ECF No. 1.) On Judge Oliver's recommendation, the Court dismissed most of the grounds in 2020. (Order Accepting 1st R. & R. 1, ECF No. 87; 1st R. & R. 48.)

The Court also accepted Judge Oliver's recommendation that she hold an evidentiary hearing regarding a subclaim in Ground Two, in which Petitioner contends his trial counsel provided ineffective assistance by failing to conduct any investigation into Messrs. Garrison and Ward, both of whom maintain that Petitioner was not the shooter. (*See* Order Accepting 1st R. & R. 1–2; 1st R. & R. 23–34, 48; Pet. 14–17.)

2

Judge Oliver heard evidence over three days in 2021 and 2022. (Mins., ECF Nos. 141–42, 154.)

In 2025, Judge Oliver issued a further report and recommendation that the remaining subclaim in Ground Two be denied and that the entire action be dismissed with prejudice. (2d R. & R. 45, ECF No. 186.) Judge Oliver reasoned that Petitioner had met his burden to show that trial counsel's performance was not objectively reasonable, but that Petitioner had not demonstrated prejudice from counsel's failure to perform any investigation into Messrs. Garrison and Ward. (*Id.* at 31–45.) Her analysis of the prejudice element rested in part on adverse credibility findings as to Messrs. Garrison and Ward with respect to their availability and willingness to testify. (*Id.* at 37–40.) On the same issue, Judge Oliver credited the testimony of DDA Santoro, the prosecutor in Petitioner's criminal trial, and Det. Duncan, the lead investigator of the 2006 shooting, who both provided testimony tending to show that they were unable to locate and subpoena Messrs. Garrison and Ward for the criminal trial. (*Id.* at 39–40.) Judge Oliver also opined that there is no reasonable likelihood the outcome of trial would have been different had Messrs. Garrison and Ward testified, again resting her position in part on adverse credibility findings as to Messrs. Garrison and Ward. (*Id.* at 40–45.)

Petitioner objected to Judge Oliver's second report and recommendation, arguing that Judge Oliver erred in her analysis of the prejudice element. (Pet.'s Objs. 3–26, ECF No. 190.) Respondent Fidencio N. Guzmán did not respond to Petitioner's objections or file his own objections.[2] In response to the objections and the oral argument of

---

[2] The Court declines to review portions of the second report and recommendation to which no party lodged objections—including Judge Oliver's findings and recommendations on the deficient performance element of the claim. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) ("The statute makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo *if objection is made*, but not otherwise."). The Court renders no opinion on whether Respondent preserved for appeal the positions he presented to Judge Oliver on

counsel on November 24, 2025, (Mins., ECF No. 192), the Court exercised its discretion under 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b)(3) to receive further testimony, (Order Re: 2d R. & R., ECF No. 195). The Court held a further evidentiary hearing on January 28, 2026. (Mins., ECF No. 211.) On February 9th, 2026, the parties filed post-hearing briefs. (Pet.'s Br., ECF No. 215; Resp.'s Br., ECF No. 216.)

## II.     LEGAL STANDARDS

### A.     Habeas Corpus and Review of Report and Recommendation

District courts are authorized to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In evaluating such an application, where a federal court has determined that "the last reasoned state court decision was contrary to or an unreasonable application of clearly established law," as this Court did when it accepted Judge Oliver's 2020 report and recommendation, the court may "evaluate the claim de novo, and . . . may consider evidence properly presented for the first time in federal court." *Crittenden v. Chappell*, 804 F.3d 998, 1010 (9th Cir. 2015) (internal quotation marks omitted).

Pursuant to 28 U.S.C. § 636(b)(1)(C), on a magistrate judge's report and recommendation, the district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." The judge "may accept, reject, or modify" the recommendation, "receive further evidence[,] or recommit the matter to the magistrate judge with instructions." *Id.*[3] Ninth Circuit authority suggests that a de novo evidentiary hearing

the deficient performance element.

[3] Petitioner asserts that the Court cannot rely on evidence admitted at the hearings

before the district court should precede reversal of a magistrate judge's credibility findings after an evidentiary hearing. *See, e.g.*, *Johnson v. Finn*, 665 F.3d 1063, 1075–76 (9th Cir. 2011); *United States v. Thoms*, 684 F.3d 893, 895 (9th Cir. 2012).[4]

### B.    Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants the effective assistance of counsel." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam); *accord Missouri v. Frye*, 566 U.S. 134, 138 (2012) ("The right to counsel is the right to effective assistance of counsel."). To succeed on an ineffective assistance of counsel claim, a defendant must demonstrate: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). The prejudice element "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Williams v. Taylor*, 529 U.S. 362, 393 n.17 (2000). A defendant may establish prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

---

before Judge Oliver in its de novo evaluation. (Pet.'s Br. 4.) The sole authority he cites for this proposition is inapposite. *Plummer v. W. Int'l Hotels Co.*, 656 F.2d 502, 505 (9th Cir. 1981) ("[T]he plaintiff has a right to introduce an EEOC probable cause determination in a Title VII lawsuit . . . ."). Subject to the qualification in the next note, the Court has considered the exhibits and testimony from the 2021 and 2022 hearings in rendering its decision.

[4] The Court acknowledges these cases arose in situations in which a district judge reversed credibility findings *favorable* to a criminal defendant or habeas petitioner. Petitioner persuasively argues the Court was not required to hold a hearing here, where the Court weighed whether to reverse *adverse* credibility findings. (Pet.'s Objs. 7–8; Joint Statement 5 n.2, ECF No. 193.) In an abundance of caution and in the interest of justice, the Court exercised its discretion under § 636(b)(1)(C) to conduct an evidentiary hearing and make its own credibility determinations, which are based solely on the Court's own perception of the witnesses at the 2026 evidentiary hearing. *See United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility.").

A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 391 (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011); *accord Strickland*, 466 U.S. at 693 ("It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.").

"[W]ith respect to defective investigations, the test for prejudice is whether the noninvestigated evidence was powerful enough to establish a probability that a reasonable attorney would decide to present it and a probability that such presentation might undermine the jury verdict." *Mickey v. Ayers*, 606 F.3d 1223, 1236–37 (9th Cir. 2010). When evaluating the prejudice resulting from failure to present the testimony of uninvestigated or uncalled witnesses, courts also evaluate whether the witness would have been available and willing to testify at trial. *E.g.*, *Day v. Quarterman*, 566 F.3d 527, 538–39 (5th Cir. 2009); *Lawrence v. Armontrout*, 900 F.2d 127, 130–31 (8th Cir. 1990); *see also, e.g.*, *Alcala v. Woodford*, 334 F.3d 862, 872–73 (9th Cir. 2003); *Tinsley v. Borg*, 895 F.2d 520, 532 (9th Cir. 1990); *United States v. Harden*, 846 F.2d 1229, 1231–32 (9th Cir. 1988).[5]

## III. DISCUSSION

Having conducted a de novo review of the portions of Judge Oliver's 2025 report and recommendation to which objections have been stated, and having heard testimony directly from the witnesses, the Court respectfully rejects Judge Oliver's findings and conclusions as to the prejudice element of Petitioner's ineffective assistance claim. Broadly, the Court finds that all witnesses testified credibly at the 2026 hearing, but the testimony of Messrs. Garrison and Ward is entitled to significant weight and is sufficient to carry Petitioner's burden on the element.

---

[5] For the purpose of argument, the Court notes but overrules Petitioner's objection to the application of this principle to his claim. (Pet.'s Br. 4 n.1; Joint Statement 5–6.)

6

**A.     Messrs. Garrison and Ward Were Available and Willing to Testify**

The record demonstrates that Messrs. Garrison and Ward could have been located and made to testify at Petitioner's 2007 trial with minimal diligence.

Mr. Garrison unequivocally stated that he would have testified at the trial, as he "kn[e]w it wasn't [Petitioner] who [he] saw running off that day."(Tr. 244, ECF No. 213; *see id.* at 243–45.) Mr. Garrison was on probation at the time of the shooting in 2006 and remained on probation through the time of Petitioner's trial in 2007. (*Id.* at 214, 228; *see id.* at 46–47; Ex. 203-4 to -5.)[6] Mr. Garrison was required to attend monthly check-ins in with his probation officer at the Compton Courthouse, the same courthouse in which Petitioner was tried. (Tr. 214–15; *see* Ex. N-009 (identifying trial location as "SOUTH CENTRAL DISTRICT").) Mr. Garrison had testified as a witness at a different trial in 2006 after he was served a subpoena in the driveway of his home address in Compton. (Tr. 215–16.) The same address appears in medical records related to Mr. Garrison's treatment for the gunshot wounds he sustained in 2006, which records the prosecution produced to the defense before trial. (Ex. 208-2; *see* Tr. 133.) This evidence tends to show that the prosecution or defense team easily could have located Mr. Garrison at his home address in Compton, an address which had been disclosed in discovery materials and where he previously had been subpoenaed. Further, the prosecution or defense team could have found Mr. Garrison through his probation officer. The Court credits Mr. Garrison's testimony that he would have accepted an invitation or obeyed a command to testify at Petitioner's trial. The Court also credits Mr. Garrison's assertion that he would be willing to testify as he was one of the victims of the crime being prosecuted. The Court reasons that a victim of a crime would prefer

---

[6] The parties lodged exhibits identified and admitted at the 2021, 2022, and 2026 evidentiary hearings as attachments to ECF Nos. 221 and 223. The Court cites the exhibit and page numbering scheme the parties affixed to the bottom of these exhibits.

justice to visit the true perpetrator and not a person who the victim knew with certainty had no involvement in the incident.

Mr. Ward similarly averred that he would have testified at the 2007 trial had the prosecution or defense team asked him to do so. (Tr. 177–78.) He represented that "at the time [he] wouldn't want an innocent man . . . to lose his life for something he did not do." (*Id.* at 149.) Mr. Ward was enrolled in high school and was skipping class at the time of the shooting. (*Id.* at 141.) Mr. Ward was on probation at the time of Petitioner's trial, and he had court dates at the Compton Courthouse at the same time as Petitioner's trial. (Tr. 149–50; *compare, e.g.*, Ex. 201-3 (memorializing Mr. Ward's preliminary hearing on Sept. 12, 2007), *with* Ex. N-018 (memorializing Petitioner's jury trial in progress on Sept. 12, 2007).) Mr. Ward acknowledged that law enforcement attempted to contact him at his grandmother's house, where he resided from his youth until well after the trial. (Tr. 147–48.) Like Mr. Garrison, Mr. Ward easily could have been contacted and located using readily available public information. The fact that law enforcement made contact with him at his residence supports this conclusion. The Court also credits Mr. Ward's representation that he would be motivated to testify to ensure that an innocent person was not convicted for a crime he did not commit.

Relevant to the Court's credibility analysis is that Messrs. Garrison and Ward submit they would have given *exculpatory*, rather than *inculpatory*, testimony had they been summoned to testify at Petitioner's trial. The record supports an inference that Messrs. Garrison and Ward would evade efforts to command their testimony in support of a conviction. For example, Mr. Garrison averred that he withheld any description of the shooter when he spoke with law enforcement officers at the hospital after the shooting. (Tr. 202.) Mr. Garrison explained, "Back then, that was just like the mentality I had. That's how I just grew up. You know, it wasn't a lie. I just withheld that part." (*Id.*) Mr. Garrison conceded that he did not ask any follow-up questions when an officer told him that law enforcement already knew who shot him. (*Id.*) However, a crucial fact of which Mr. Garrison was unaware was that law enforcement had identified *Petitioner*

as the shooter. Had law enforcement, the prosecution team, or (as is relevant to the *Strickland* inquiry) the defense team informed Mr. Garrison that Petitioner was being prosecuted, Mr. Garrison readily would have provided a negative identification:

> THE COURT: . . . [L]et's say the police in the hospital tell you they know who did it and it was definitely Williams. Would you have told them that it wasn't?
>
> [MR. GARRISON[7]]: Sure. Yes. I would have said for sure then.

(Tr. 245–46.) Mr. Ward testified that he told officers he was asleep at the time of the incident "[b]ecause [he] was on probation, [he] was scared, [he] didn't want to get involved in it, [and he] didn't want to go back to jail if [he] lied," (*id.* at 170), but that he would have told the defense team what he had seen if they had approached him "because they're not the police," (*id.* at 176; *see also id.* at 149), and that he would have testified on behalf of the prosecution if asked, (*id.* at 178). The Court acknowledges that Messrs. Garrison and Ward likely would have been reticent to testify at the trial of an individual who they sincerely believed shot or might have shot Messrs. Garrison and Akbar. Providing a description of the shooter, asking questions of law enforcement about potential suspects, and admitting to being an eyewitness carried a risk that Messrs. Garrison and Ward would be swept into the prosecution's case against the actual shooter, whoever it was. But the dispositive question here is not whether Messrs. Garrison and Ward would have testified at *any* trial concerning the shooting, but whether they would have testified at *Petitioner's* trial. Both testified that they did not know before or during the trial that the prosecution had identified Petitioner as the shooter. (Tr. 177, 206.) As detailed below, both witnesses unequivocally maintain that Petitioner was not the shooter. Had defense counsel—or anyone else—informed them that Petitioner was on trial for the 2006 shooting, they likely would have participated in

---

[7] The transcript mistakenly identifies the Court as the responding to its own question.

9

the trial proceedings given their firm conviction that Petitioner does not fit the profile of the shooter they saw.

Judge Oliver opined that Messrs. Garrison and Ward's assertions that they would have testified were "dubious at best" given that she observed "no evidence that either witness made any attempts to find out what happened in this case or who was ultimately prosecuted for it." (2d R. & R. 39.) On the de novo evidentiary record, the Court respectfully views Messrs. Garrison and Ward's lack of interest in the prosecution of Petitioner more charitably than Judge Oliver did. Tracking the status of criminal cases before this Court is a challenge that requires the attention of numerous trained and experienced civil servants; the Court is uncertain how or why laypeople such as Messrs. Garrison and Ward might keep apprised of criminal proceedings if they were unaware of who, if anyone, was being prosecuted for the shooting. Further, both Messrs. Garrison and Ward were subject to the scrutiny of law enforcement at the time for unrelated incidents and, accordingly, might have been discouraged from making inquiries into the investigation or prosecution of the shooting. (See Tr. 219–20 (Mr. Garrison stating law enforcement was "just always unfair").) Indulging their curiosity would have created an appreciable personal risk.

The Court credits Messrs. Garrison and Ward's accounts about their availability and willingness to testify over the countervailing evidence. Det. Duncan testified about his general practices in attempting to locate witnesses, but he admitted that he did not remember what he did to look for Messrs. Garrison and Ward specifically. (Tr. 26–27, 73, 83; see id. at 27–28, 77.) Similarly, DDA Santoro recounted that he had asked Det. Duncan orally and in writing to find Messrs. Garrison and Ward, but he could not recall what Det. Duncan had done to try to find them. (Id. at 88–91; see Ex. 300-01.) While the Court concurs with Judge Oliver's assessment that Det. Duncan and DDA Santoro testified credibly on these issues, (see 2d R. & R. 39), the Court finds that their testimony is minimally probative as to whether Messrs. Garrison and Ward were available and willing to testify at Petitioner's trial in 2007. First, Det. Duncan and DDA

Santoro do not remember any specific details about their efforts to locate Messrs. Garrison and Ward. While the memories of Det. Duncan and DDA Santoro may have faded in the two decades since the investigation and trial, the Court declines to conclude that Messrs. Garrison and Ward were evading outreach efforts based on general testimony describing methods for finding witnesses, which methods may or may not have been used here. Second, at the time of the investigation and trial, Messrs. Garrison and Ward had routine contact with public entities, including school, law enforcement, court, and probation, that necessarily generated records that would have been available to Det. Duncan and DDA Santoro. Even if "[t]he database and data systems were a lot different in 2006," the witnesses' regular contacts with and supervision under public authorities undercuts an inference that Det. Duncan and DDA Santoro, consistent with their general practices, exhausted the resources at their disposal to locate the witnesses, (Tr. 73), particularly given that the only documentary evidence memorializing Det. Duncan and DDA Santoro's efforts or requests to locate civilian eyewitnesses predates the trial by a year, (Ex. 300-01 (dated Aug. 20, 2006)). Either Det. Duncan and DDA Santoro should have been able to locate the witnesses using public records and resources sometime in the year leading up to trial, or their efforts were inconsistent with their general practices. Finally, there is no evidence that, in whatever search efforts they undertook, Det. Duncan and DDA Santoro ever divulged that Petitioner was being prosecuted for the shooting. As discussed, that detail likely would have materially impacted Messrs. Garrison and Ward's responsiveness to their inquiries.

Finally, the Court accords negligible weight to the two other strains of record evidence Judge Oliver credited in her analysis of Messrs. Garrison and Ward's availability and willingness to testify: the lack of cooperation by two eyewitnesses who testified at trial, Mr. Akbar and Richard Givens, and Petitioner's codefendant's motion to continue trial based on counsel's intent to investigate and subpoena unspecified witnesses. (2d R. & R. 38–39.) Neither strain is particularly availing. The fact that two testifying witnesses were uncooperative has little probative value as to whether two

different individuals would have testified if asked or compelled. If anything, the fact that the uncooperative witnesses ultimately appeared and gave exculpatory testimony after being subjected to process raises an inference that Messrs. Garrison and Ward would have done similarly had anyone expended the resources to investigate and serve them. (*See* 7 RT 1539, ECF No. 121-9 (Mr. Akbar stating that he was arrested and required to come to trial); 8 RT 1948–49, ECF No. 121-10 (Richard Givens stating that he was subpoenaed to testify at trial).) And the record does not demonstrate that the codefendant's counsel had difficulty locating Messrs. Garrison and Ward in particular, let alone what efforts he made to find any witnesses. (*See* Ex. 301-02 (codefendant's counsel declaring that "there are witnesses who need to be interviewed and subpoenaed for trial"); Tr. 91 (DDA Santoro: "I spoke with [the codefendant's counsel] about me trying to find the witnesses, all of them. I'm not sure I said Garrison versus Ward versus Akbar, but just generally the witnesses.").)

Ultimately, the Court credits Messrs. Garrison and Ward's assurances that they would have testified had they known Petitioner was being tried and had they been asked or commanded to do so.

**B.      Messrs. Garrison and Ward's Accounts Were Powerful Enough to Establish a Probability that a Reasonable Attorney Would Decide to Present Them and that Such Presentation Might Undermine the Verdict**

Messrs. Garrison and Ward provided assured, dispassionate testimony at the evidentiary hearing unequivocally averring Petitioner was not the perpetrator of the shooting. Notwithstanding the possibility that a jury could doubt or discount Messrs. Garrison and Ward's accounts and the overall strength of the prosecution's case, the record demonstrates there is a probability that a reasonable attorney would decide to call them and a probability that their testimony might undermine the jury verdict.

Mr. Garrison testified that he knew Petitioner "from around the way," in that they were from close neighborhoods and had played basketball in the same area in the early 2000s. (Tr. 194; *accord id.* at 219.) Mr. Garrison recalled that Mr. Willaims was a "[t]all, dark-skinned, slender dude." (*Id.* at 194; *see also id.* ("6'5", 6'6", I'll put [Petitioner] at.").) As to the shooting, Mr. Garrison stated that less than a minute after he pulled up to a barber shop before noon, he heard shots ring out just as he was shuffling "a couple of shoeboxes" in the back seat of his vehicle. (*Id.* at 195–96.) He stayed in position until the shooting stopped, then "looked up and . . . saw the shooter like running away basically." (*Id.* at 196–97.) He had a three-to-four second window of unobstructed visual observation. (*Id.* at 197.) Mr. Garrison described himself as having medium brown skin and standing six feet, one inch tall, and the shooter as "a couple shades lighter than me, shorter than I am." (*Id.*; *see also id.* at 231 (stating the shooter had "light brown" skin and stood "between 5'4" or 5'7").) Mr. Garrison believed, based on skin tone, that the individual could have been Black or Hispanic. (*Id.* at 231.) He said the shooter wore darker-colored clothing, which made his skin tone more noticeable given the contrast. (*See id.* at 198.) Mr. Garrison asserted that he knows that Petitioner was not the shooter because the person he saw was not as tall as Petitioner— "It's like saying Shaq was accused of a crime. . . . It's just like, it's two different people for sure." (*Id.* at 219.)

Mr. Ward was familiar with Petitioner in that he had "seen [Petitioner] around," such as at a gym and barbershop, but he was not friends with Petitioner. (Tr. 139–40.) Mr. Ward recalled that Petitioner looked "kind of like the rapper Snoop Dogg" in that he was "tall and dark-skinned." (*Id.* at 140.) Mr. Ward was in the back seat of Mr. Garrison's car when he heard gunshots less than a minute after arriving at the barber shop. (*Id.* at 142–43.) Another passenger in the car (identified by counsel as Mr. Akbar, (*see id.* at 160–61)) fell on top of him. (*Id.* at 143.) After the shots stopped, he popped his head up and saw for "[a] few seconds" two men running away, one with a white T-shirt and the other with a black hoodie. (*Id.* at 161; *see id.* at 143–45.) The men had skin

13

with "[l]ighter colored pigmentation" such that Mr. Ward was uncertain whether they were "Hispanic or a light skinned African American." (*Id.* at 162–63.) The men were shorter than or of similar height to Mr. Ward, who is six feet tall. (*Id.* at 146, 164.) Mr. Ward denied that either man looked like Petitioner. (*Id.* at 146–47.)

Benefitting from the "great advantage" of live testimony, *Thoms*, 684 F.3d at 905, the Court finds the accounts of Messrs. Garrison and Ward wholly credible. Both soberly recounted the events of the 2006 shooting with appropriate detail, acknowledged the limits of their observations of the shooter, and made unequivocal negative identifications based on those observations. Particularly salient to the witnesses' assertion that Petitioner was not the shooter was his dark complexion and height. Both witnesses independently compared Petitioner to unusually tall celebrities, and both said the suspected shooter was shorter than them—that is, shorter than six feet tall. Both asserted, consistent with what the Court observed of Petitioner on videoconference during the hearing, that Petitioner has a dark skin tone, whereas the individual they saw fleeing the scene of the shooting had a relatively lighter skin tone. The witnesses' independent recollections of their perception of the shooter corroborate each other and would have provided powerful evidence for the defense had the witnesses testified at trial. A reasonable attorney probably would have called them.

Had they testified at Petitioner's trial in 2007, Messrs. Garrison and Ward's testimony would have "altered significantly the evidentiary posture of the case." *Brown v. Myers*, 137 F.3d 1154, 1157 (9th Cir. 1998). A reasonable jury could credit the testimony of Messrs. Garrison and Ward notwithstanding inconsistencies Respondent perceives in their accounts and the possibility that the prosecution could have attempted to impeach them. (Resp.'s Br. 8–16.) Notably, Messrs. Garrison and Ward categorically denied that they provided any description of the suspected shooter to police investigators in 2006, placing police reports stating they had done so into dispute. (*Compare* Tr. 147–48, 233, *with* Exs. 13-3, 14-2.) A jury could reason, just as the Court did in its analysis of Messrs. Garrison and Ward's willingness to testify, that the

witnesses would not have provided possibly inculpatory evidence to police investigators.

In the context of all the trial evidence, the jury could have accorded Messrs. Garrison and Ward's accounts significant weight and acquitted Petitioner. Mr. Akbar, the other victim, was the only testifying eyewitness to have purportedly seen the gunman. Det. Duncan testified that Mr. Akbar said he saw a "tall six-three to six-five thin male Black" person running from the scene, and that Mr. Akbar positively identified Petitioner in a six-pack photographic lineup. (11 RT 2725, 2752, ECF No. 121-13.) In contrast, Mr. Akbar testified that he "didn't see anybody shooting" at him, and he denied having told police that he identified the shooter as "a tall, dark male, Black, 6'3" to 6'5"." (7 RT 1554.) The jury requested more than once to review trial testimony pertaining to Mr. Akbar. (*See* 2 CT 166–67, 172, ECF No. 121-2.) Even accepting arguendo that the prosecution's case against Petitioner was strong for the reasons persuasively articulated by Respondent and Judge Oliver, (Resp.'s Br. 16–22; 2d R. & R. 43–45), Messrs. Garrison and Ward's negative identification of Petitioner as the shooter could have given jurors a reasonable doubt as to his guilt considering the apparent weight the jury gave to evidence pertaining to Mr. Akbar, the only trial witness who might have seen the gunman. Further, testimony from Messrs. Garrison and Ward disputing that they had provided positive identifications to law enforcement could have impacted the jury's perception of Det. Duncan's credibility as to what Mr. Akbar (or Messrs. Garrison and Ward) had told him about the shooter's appearance. The jury deliberated for three days, making it all the more likely that the outcome of trial could have been different had two additional eyewitnesses testified. (2 CT 169–70, 173–74, 241–42.) *See United States v. Caruto*, 532 F.3d 822, 832 (9th Cir. 2008) ("Longer jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case." (internal quotation marks omitted)); *cf., e.g., Parker v. Gladden*, 385 U.S. 363, 365 (1966) (noting in prejudice evaluation that "the jurors deliberated for 26 hours, indicating a difference among them as to the guilt of

petitioner"); *Jennings v. Woodford*, 290 F.3d 1006, 1019 (9th Cir. 2002) (reasoning it was "reasonably probable that . . . [the jury] would have found a reasonable doubt" given that the jury had "deliberated for two full days").

Having assessed the credibility of the witnesses who testified in 2026 and considered the totality of evidence before the jury at trial in 2007, the Court determines that there is a probability that the jury could have acquitted Petitioner had Messrs. Garrison and Ward been called to testify, as any competent lawyer likely would have done. *Strickland*, 466 U.S. at 696.

## IV.    CONCLUSION

For the reasons stated, the Court sustains Petitioner's objections to Judge Oliver's 2025 report and recommendation and respectfully rejects Judge Oliver's report and recommendation on the prejudice element of Petitioner's ineffective assistance subclaim in Ground Two. The Court determines that Petitioner has carried his burden to show his trial counsel provided deficient performance prejudicing his defense within the framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to perform any investigation into witnesses Dayon Garrison and Christopher Ward.

The Court grants the petition for a writ of habeas corpus and orders Respondent to release Petitioner within seven days after entry of judgment, subject to appropriate release conditions, unless the State of California elects to retry Petitioner. Respondent shall file a report within 14 days of entry of judgment stating whether Petitioner was released or will be retried. Judgment shall enter forthwith.

**IT IS SO ORDERED.**

Dated: February 24, 2026

_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE